**Swart v Mercer Sq. Owners Corp.**

2026 NY Slip Op 30858(U)

February 17, 2026

Supreme Court, New York County

Docket Number: Index No. 159371/2016

Judge: David B. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  **HON. DAVID B. COHEN**          PART _____58_____

*Justice*

--------------------------------------------------------------------------------X

MARTINA SWART

INDEX NO.          159371/2016

Plaintiff,

- v -                                                   **DECISION AFTER TRIAL**

MERCER SQUARE OWNERS CORP.,

Defendant.

--------------------------------------------------------------------------------X

Plaintiff is the cooperative unit owner of Unit C203 at 250 Mercer Street, New York, New York (the "unit" or the "apartment"). Defendant is the cooperative corporation which owns the building.

This action stems from a radiator leak in plaintiff's unit on December 19, 2014, which caused scalding hot steam and water to spew from the radiator located in plaintiff's living room, causing flooding and other resulting water damage in her unit.

This Court conducted a bench trial over the course of several days. At trial, the plaintiff testified on her behalf and also called Ms. Aurelie Paradiso, a designer and owner's representative hired by the plaintiff in January 2015 to manage the repairs in plaintiff's unit after the flood, and Mr. Michael McGinnis who leased the unit from plaintiff, was residing in the unit at the time of the radiator leak, and who vacated the apartment on February 28, 2015. Plaintiff also offered readings from the deposition testimony of Ms. Brenda Ballison, employed by the building's property manager Douglas Elliman as the building manager, and Ms. Sara Litman, a Board Member at the time of the flood.

[* 1]

The defense called Mr. Michael Hart, who served as the resident manager of the 250 Mercer Street building at the time of the radiator leak, and Prashanth Reddy, who resides at 250 Mercer Street, Apartment C606, and was a member of the Board at the time of the leak.

Relevant Lease Provisions:

The parties agreed that the following proprietary lease provisions govern here:

Paragraph 2 provides:

The Lessor shall at its expense keep in good repair all of the Residential Unit of the building including all of the apartments, and its equipment and apparatus except those portions the maintenance and repair of which are expressly stated to be the responsibility of the Lessee pursuant to Paragraph 18 hereof . . .

Paragraph 18(a) provides in pertinent part:

The Lessee shall take possession of the apartment and its appurtenances and fixtures "as is" as of the commencement of the term hereof. Subject to the provisions of Paragraph 4 above, the Lessee shall keep the interior of the apartment (including interior walls, floors, and ceilings, but excluding windows, window panes, window frames, sashes, sills, entrance doors, frames and saddles) in good repair, shall do all of the painting and decorating required to his apartment, including the interior of window frames, sashes and sills, and shall be solely responsible for the maintenance, repair, and replacement of plumbing, gas, and heating fixtures and equipment and such refrigerators, dishwashers, removable and through-the-wall air conditioners, washing machines, ranges and other appliances, as may be in the apartment. Plumbing, gas and heating fixtures as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which the Lessee may install within the wall or ceiling, or under the floor, but shall not include gas, steam, water or other pipes or conduits within the walls, ceiling or floors or air conditioning or heating equipment which is part of the standard building equipment. The Lessee shall be solely responsible for the maintenance, repair and replacement of all lighting and electrical fixtures, appliances, and equipment and all meters, fuse boxes or circuit breakers and electrical wiring and conduits from the junction box at the riser into and through the Lessee's apartment. . . .

Plaintiff's Witnesses:

Testimony of Aurelie Paradiso:

Paradiso is a design and architectural consultant and owner's representative. She knew plaintiff first in a social capacity and then was hired by her in late-January 2015 to serve as her

representative to manage the design process and oversee the reconstruction of the unit after the leak, as plaintiff was living in London at the time. She first went to plaintiff's apartment after the flood on February 4, 2015, to meet Tim Barnard, the structural engineer hired by plaintiff, to do a structural assessment and to witness the wall probes with Hart, the building's architect, Teal Usher of Rick Kramer Architects, P.C. ("RKA"), and a building representative.

Paradiso observed water damage predominantly in the living area near the radiators and less so toward the front door. The floorboards were warped and buckling and the base of the cabinets were damaged. She was advised that the wall probes had not been performed because plaintiff had withdrawn her permission to cut the walls, although it was her understanding that plaintiff had requested that Paradiso be present when they cut them. Usher took moisture readings and the RKA report of February 4, 2015 shows elevated moisture reading at several locations. RKA indicated that the wall needed to be probed, a return inspection needed to be made to take moisture readings, and large box fans needed to be installed to help dry out the space more quickly.

That same day, Paradiso communicated to plaintiff via email indicating that the apartment was not livable -- that it was not in a condition to be occupied as it needed repairs to the floors and possibly the wall, that it smelled damp, and there was potential for mold and mildew. Paradiso then communicated with Ballison and received the January 7, 2015 report prepared by RKA. and thereafter received the RKA report from February 4, 2015.

Paradiso was aware of plaintiff's Shareholder Alterations Request dated February 2, 2015 that was in evidence and that there was also a submission on February 16, 2015. This resulted in a response from RKA, dated March 5, 2015, with comments, notes and requirements. RKA required, inter alia, that the entire apartment subfloor be waterproofed and that the fire rating

[* 3]

between the apartments be enhanced. Paradiso responded on March 9, 2015, agreeing to all requests. RKA responded on March 17, 2015, indicating that it had received the scope of work from Batiment Consulting ("Batiment") the general contractor, on March 16, 2015, and generally approved the work to commence once a legible demolition and construction schedule was provided.

Plaintiff was then given approval to start work around March 30, 2015. At that point, Paradiso's role involved onboarding with Batiment and its principal Franz, getting bids and estimates, and making sure that Franz knew when he was going to start work and what he needed to accomplish. The project began in April, and per an email from board member Jennifer Desmond, the demolition work was briefly stopped by defendant during the third week in April. Paradiso went to the apartment, whereupon she communicated directly with Usher, revised the floor assembly detail to meet Usher's expectations, and the work resumed fairly quickly. Also, the work on the subfloor and the floor was given over to a subcontractor called Norwegian Wood. The job was completed in June 2015. Paradiso's testimony was credible in all respects.

Testimony of Michael McGinnis:

McGinnis was plaintiff's tenant pursuant to a sublease with a monthly rent of $4,895.00, commencing on May 1, 2014 and set to expire on April 30, 2015. The two radiators in the apartment had a radiator cover structure built around them. The top of the cover of the radiator at issue lifted off or flipped up to permit access the radiator below and generally had cushions resting on top. The box did not go all the way to the ground in front, and there was a cut out three or four inches above the floor to allow the heat to emanate into the apartment.

On the morning of December 19, 2014, McGinnis was sleeping on his couch in the downstairs part of the duplex apartment. At approximately 6:00 a.m. McGinnis was awakened

from his sleep by the sensation of steam on his face and body and the feeling that that he was sleeping in a steam room. Within moments he realized that the steam was coming from the radiator and filling the apartment and he saw water pouring out of the radiator and puddling nearby. He immediately went downstairs to the night doorman to report the problem, who prompted the night maintenance person to go back upstairs with McGinnis. They went back upstairs, the maintenance person first getting his tools, and observed that there was still boiling hot steam and water coming from the radiator.

The only approach to the radiator and valve was from above, so they opened the top of the radiator cover, but they were not able to stand close enough for long enough to get through the scalding hot steam and water to reach the valve. They even tried to use the top cushion to block the flow of steam in an effort to get to the valve, but to no avail, as the boiling hot water was burning both of them. McGinnis put on gloves and the maintenance person may have gone downstairs to see if he could get more durable gloves. Even with the tools, they had no success getting to the valve.

After five or 10 minutes of trying to get to the valve and realizing they were not going to have success, they went back downstairs to the doorman who called Hart, but McGinnis got the impression that there was some indecision on how to proceed. They returned back to the apartment to find it completely full of steam with virtually no visibility. They went back downstairs again. That was when the police arrived because an alarm had been triggered in the shoe store below the apartment. Hart was on the telephone and after some discussion, including McGinnis talking to Hart on the phone, the officer took the phone and told Hart that he needed to turn off the water. McGinnis believed that this direction occurred about 25 minutes after the initial event.

[* 5]

The building's boiler was then shut down and McGinnis was advised that it would still take 10 to 15 minutes until the water stopped flowing from the radiator. McGinnis returned to the apartment again and steam was still flowing from the radiator into the apartment. It eventually stopped with the cabinetry still on the radiator and he did not know how, or by whom, the radiator cover was later removed. Ultimately, the steam reached into the hallway and the water went all the way to the front door.

After the police had gone, the fire department arrived and then quickly left. Later that morning, McGinnis sent plaintiff an email describing what had occurred and had a telephone conversation with plaintiff on January 7, 2015, in which she asked him to write up a detailed timeline of the events of December 19, 2014, and on January 16, 2015, he sent her that timeline.

Prior to the incident, McGinnis had never inspected the radiators in the apartment, did any work on them, had a leak from them, or complained about them. McGinnis was unable to describe the radiator in any detail, nor could he say that the later replacement radiator was the same as the radiator that had leaked.

McGinnis ultimately decided that he did not want to live in the apartment during a pretty extensive, multiple-month, repair project and plaintiff agreed to let him out of the remainder of his lease. He vacated the apartment at the end of February 2015, as agreed, and plaintiff returned him two months of rent that he had prepaid. McGinnis's testimony was credible in all respects.

Deposition Testimony of Brenda Ballison:

Ballison was employed by Douglas Elliman as the building manager of 250 Mercer Street. She learned of the flood in plaintiff's apartment and the resulting cascading water from Hart, who was assessing the damages. It was her position that if something happened to an original radiator that had not been altered, the building would be responsible. The insurance

carrier provided funds to be disbursed for damages within the apartments and these funds were deposited into the cooperative Corporation's account.

Deposition Testimony of Sara Litman:

Litman was aware that the water remained on for approximately 45 minutes after the flood was first reported to the building. A meeting was scheduled for plaintiff, Ballison, and Board members to inspect plaintiff's apartment. A flood situation is not handled by the cooperative Board, it is handled by the super and the building manger, the Board has nothing to do with repairs and Litman doesn't inspect apartments. Funds were allocated for repairs in plaintiff's apartment, and Litman was not aware that none of those funds were actually paid to plaintiff until the day before her deposition.

Plaintiff's Testimony:

Plaintiff testified that she purchased the apartment in September 2006, the apartment was in great condition, and she never replaced a radiator in the apartment prior to the incident. Regarding the radiator, plaintiff testified that from the time she moved in until the date of the radiator leak, she never did any work on a radiator or replaced a radiator in the apartment. Nor was plaintiff aware of whether any of the prior shareholders, going back to 1986, ever changed the radiator, nor if the radiators in her apartment had ever been changed going back to 1920 when the building was built.

Following plaintiff's flood, she learned that there had been other floods or circumstances where other unit owners had issues with their radiators. She was aware that the radiator was manufactured by a Brooklyn-based company named Governale. Although plaintiff herself contended that the radiator was part of the standard building equipment, she conceded that she

did not think that any document or photograph in evidence established that fact, nor was she aware of anybody who might know whether or not the radiator was standard building equipment.

Plaintiff further conceded that she would not know whether something is standard equipment or not and that she has seen no evidence that her radiator was not standard. Plaintiff also testified that Hart had stated that radiator in her apartment was the same as the one in Lois Rosenthal's apartment, but in fact, Hart did not so testify. She did correctly attribute to Hart the statement that he did not know if her radiator was standard building equipment.

Prior to the flood, plaintiff had moved to London for work and decided to rent the apartment. On December 19, 2014, she was advised of the incident first by McGinnis by email and then she spoke to him on the phone. Plaintiff also received an email from Hart regarding the incident, and she spoke to Hart on the phone and was advised by him that she was responsible for the repairs.

Plaintiff traveled to New York on December 26, 2014, at which time she met with Hart who again advised her that she was responsible for the repairs. She hired a mold remediation company, and Paradiso to assist with overseeing the repairs.

Plaintiff also hired attorney Bryan Kishner, Esq. to correspond with the Board on her behalf. Kishner wrote to the Board of Directors of the defendant on January 25, 2015, stating that the radiator was part of the standard building equipment. He wrote to Ballison on February 3, 2015, reiterating this point and asking if the floors were the defendant's responsibility. Ballison wrote back indicating that these issues were still being determined, but that the floors were the building's responsibility. Ballison confirmed this fact again on March 31, 2025.

Plaintiff sent an extensive email to board member Jennifer Desmond on March 6, 2015, wherein she indicated that, "as discussed with Ballison," the cost of the mitigation, remediation

[* 8]

and repair work in her apartment would be borne by the defendant via their insurance company. Nothing in the record suggests that this email ever received a response.

Plaintiff was advised that, prior to performing the work in her apartment, she was required to enter into an alteration agreement. The work progressed but was stopped by Desmond and Hart in mid-April 2015 to have the subfloors inspected.

At some point, plaintiff stopped paying her maintenance and was later advised that she was in default in that she owed maintenance, legal fees, late fees, plumbing charges and other fees. Plaintiff paid the maintenance bill in order not to delay approval for her to sublet the apartment once the work was completed.

Plaintiff received the casualty accident report by email on August 11, 2015. By email dated September 11, 2015, Ballison advised plaintiff that defendant was only offering her $16,281.93 in reimbursement as that was the value assigned to the claim by defendant's insurance company. Defendants retained all the insurance proceeds, never paying them over to plaintiff, nor was the $16,281.93 ever credited to her maintenance account.

Plaintiff also testified in detail about other, often extensive, correspondence with members of the Board of Directors of the defendant and management and also testified extensively about the details of her damages claims and her expenses incurred.

Plaintiff claims damages associated with the cost of the remediation of her apartment totaling $197,121.19.

This court found plaintiff credible in some respects, however, as will be discussed below, her insistence that the defendant is liable under the proprietary lease in the absence of any proffered evidence that the radiator was standard building equipment is nothing more than wishful thinking on her part. Also, her claims that the defendant agreed to cover all expenses

[* 9]

associated with the remediation were unsupported by the written documents of record and are thus also rejected as incredible. In that sense, plaintiff's testimony was influenced, likely unintentionally, by her interest in the outcome of the trial. By contrast, unchallenged receipts and invoices support her claims for the damages associated with the floor remediation and those claims are credited to the extent detailed below.

Defendant's Witnesses:

Testimony of Michael Hart:

Hart was the resident manager of 250 Mercer Street for about one year which included the time of the radiator leak at issue. He has 38 years of experience in the building management industry. He never met the plaintiff in person but communicated with her on the phone and via email.

On December 19, 2014, at 6:30 a.m. he was traveling to the building from JFK airport when he received a phone call from a porter named Victor advising him that the radiator in plaintiff's apartment was leaking. When a radiator breaks, extremely hot water comes out of it. Hart advised Victor to shut off the shut-off valves connected to the radiator in the apartment.

Approximately five to 10 minutes later, Victor called Hart back and advised him that he could not access the shut-off valve because there was a custom-built cabinet preventing access to the radiator and he could not further investigate to try to locate the valve because of the steam in the apartment pushing him back from the radiator.

Hart then told Victor to run down to the boiler room and shut off the heating pumps to release pressure on the heating system. It typically took approximately 30 minutes for the water to drain out of the system until no more water would come out of a broken radiator in an

[* 10]

apartment. Police and Fire Department personnel were called to the scene and the water was shut off a little while after the Fire Department arrived.

Once Hart got to the building, he went to the boiler room to confirm that the system was shut down and then went up to plaintiff's apartment. He observed that there was a lot of water that had come from plaintiff's radiator, that the radiator had cracked, and there was damage to the floor. He was able to see the radiator because the custom cabinet has been removed (presumably by the Fire Department). The crack was on the bottom of the radiator underneath in and towards the center. He observed a hairline crack and a little bit of rust and water. It was a cast iron radiator approximately 18 to 24 inches high, 10 inches high and four inches wide.

Hart then called the plumber to restore the heating for the building, and he called Demar Plumbers, who came that day and furnished and installed a new cast iron radiator, with piping and fittings, in plaintiff's apartment (at a cost of $1,501.22). According to Hart, the replacement radiator was the same particular type of radiator that had cracked.

He emailed plaintiff the next day to inform her of the water leak due to the cracked radiator, indicating that there was extensive damage to the apartment and the store below, and he was having plumbers come to do repairs in order to turn the heating system back on and Branch Remediation to provide remediation services.

Plaintiff emailed Hart on December 22, 2014 with a list of questions and Hart responded the next day. He advised, inter alia, that the heating had been turned back on in her apartment in the late afternoon on the day of the flood, that Demar had replaced the cracked cast iron radiator with the same type and installed new shut-off valves, that he had her old radiator, and that the severe damage could have been avoided had her radiator shut-off value not been blocked by the built-in wood cabinet covering the radiator.

Hart advised plaintiff that she was responsible for repairs to the radiator and the floors, which was based upon his experience, but he never reviewed 250 Mercer's By-laws (in court he stated that it was his belief that the floors are the building's responsibility, but provided no basis for this statement either).

Hart could not state whether or not plaintiff's radiator was standard or not, and he admitted that he did not have personal knowledge of whether there was an access issue because he never saw plaintiff's radiator prior to December 16, 2014.

This court found Hart's testimony credible in all respects. However, with respect to the events on December 19, 2014, prior to Hart's arrival at the building, I find that McGinnis's more detailed recollection is the more accurate of the two accounts as to the sequence of events of that morning.

Testimony of Prashanth Reddy:

Reddy purchased his apartment, C606, in the building in 1997 and purchased another apartment, C607, the following year, that he rented out. The building was built in the late 1800's and was converted to condominiums in 1978. He and his wife had a social relationship with plaintiff and he had been to her apartment perhaps a dozen times, however, her radiator had an encasement built around it, so he did not see plaintiff's radiator prior to the incident.

Reddy had knowledge of the leak at issue in plaintiff's apartment because plaintiff notified him immediately, but he was not aware that water continued to flood plaintiff's apartment for about 45 minutes. He was not one of the people who communicated with plaintiff about her leak in an official capacity, and he did not speak with Desmond or Litman about the leak. He was not aware of plaintiff's claim that Ballison had said on more than one occasion that the building was responsible for the repairs.

Reddy replaced his own radiator in C606, which was one of the frequent apartment upgrades performed in the building, as per plans that he reviewed as a member of the Board and its alterations committee. Reddy testified as to his understanding that the coop was only responsible for radiators that were original building equipment which he understood to be the same as standard building equipment. He said that the original radiators were Slant/Fin type or brand radiators, of which he had one in apartment C607. He had looked at a few dozen radiators in various apartments and a decent amount were the Slant/Fin radiator, which he believed is the standard radiator based upon the predominance of the Slant/Fin radiator throughout the building since he moved there in 1997. He did not have any documents detailing information about the original radiators in the building.

Reddy's testimony was credible in all respects.

Relevant Correspondence in Evidence:

On January 28, 2015, Ballison emailed plaintiff that the radiator was not original, therefore, it had been replaced either before or after plaintiff purchased the apartment, and that the damage from the leak would be plaintiff's responsibility.

On February 4, 2015, Ballison wrote in an email to plaintiff's then-attorney that defendant was still determining if the radiator was original and would advise upon further investigation and that "Yes the floors are the building's responsibility and the other items will be determined."

On March 31, 2015, Ballison wrote in an email response to plaintiff that "[t]he floors will be paid by the corporation as previously stated."

On September 11, 2015, Ballison emailed the plaintiff offering to pay her $16,281.93 for her claim based upon the building's insurance determination of the value of the claim.

Defendant had received only $6,281.93 on the claim since its policy had a $10,000. deductible. Plaintiff rejected this offer the same day.

Plaintiff's contentions

Plaintiff claims that her proprietary lease provides that the cooperative is responsible for repairing walls, floors ceilings, pipes, wiring and conduits. She argues that the radiator in her apartment was Standard Building Equipment, that defendants made no effort to show that the radiator was not standard, and that Hart and Reddy had little direct knowledge of the status of the radiators. Plaintiff further asserts that defendant's officers and agents admitted liability and that defendant reneged on its agreement to abate her maintenance. Moreover, she maintains, defendant converted insurance funds that were due to plaintiff and never fully accounted for these funds.

Plaintiff claims $197,121.19 in damages directly related to reconstructing her apartment, no less than $20,000.00 in travel expenses and no less than $200,000.00 in legal fees in an amount to be determined at a hearing, for a total of $417,121.19 plus statutory interest.

Conclusions of Law

To make out a cause of action for breach of the proprietary lease, plaintiff must establish that a duty existed under that proprietary lease and that defendant's breach of that duty caused damage to the plaintiff (*see, Shapiro v. 350 78th Street Tenants Corp.*, 85 AD3d 601, 602 [1st Dept 2011] [failure of defendants to repair roof deprived plaintiff of its use in violation of offering plan and proprietary lease]).

Plaintiff, citing *Shackman v. 400 E. 85th Street Realty Corp.*, 2017 WL 1232520, 2017 Slip Op. 30618(U) (Bannon, J.), *aff'd as modified* 161 AD3d 438 (1st Dept 2018), claims that

defendant's duty arises from the proprietary lease and requires defendant to keep the apartment in good repair except for portions stated to be her responsibility.

As relevant here, the lease provides that "plaintiff is solely responsible for the maintenance, repair, and replacement of . . . heating fixtures and equipment . . . as may be in the apartment. . . . Plumbing gas and heating fixtures as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached . . . but shall not include heating equipment which is part of the standard building equipment." (Pl. Ex. 2, Para. 18[a]).

There is no dispute that the leak was caused by plaintiff's cracked radiator, so plaintiff is responsible for the radiator unless she can prove that the radiator was standard building equipment. Other New York cases referencing the term "standard building equipment" provide no applicable guidance on its definition (*see Goldenberg v South Tower Corp.*, 151 AD3d 522 [1st Dept 2017]; *Franklin Apartment Associates, Inc. v Westbrook Tenants Corp.*, 43 AD3d 860 [2d Dept 2007]; *Machado v Clinton Housing Dev. Co., Inc.*, 20 AD3d 307 [1st Dept 2005]; *de Socio v 136 East 56th Street Owners, Inc.*, 61 Misc3d 1220[A] [Civ Ct, New York County 2018]).

Further, while the Court in *Shackman,* in granting partial summary judgment, ruled that the plaintiffs established that the plumbing appurtenances connected to their HVAC unit were installed as an element of standard building equipment and that defendants did not contradict this showing, this finding is unhelpful to this Courts analysis because that Court did not specify what facts underlay its determination (*Shackman*, at *3) .

Upon review of plaintiff's testimony, the testimony of each of her witnesses, the deposition transcripts read and the documents in evidence, this Court finds there is an utter lack

of any evidence presented on plaintiff's direct case to support a claim that her radiator was standard building equipment. Plaintiff and her witnesses did not offer any evidence to suggest what if any radiators were standard to the building, or that would tend to suggest that her radiator would fall into such category. As such, this Court must find that plaintiff has failed to meet her burden to establish by a fair preponderance of the credible evidence that plaintiff's radiator was standard building equipment (*People by James v Trump*, ___ AD3d ___, 237 NYS3d 443, 462-463 [1st Dept 2025, Moulton, J., concurring] [preponderance of the evidence is the default burden of proof in civil cases]).

Further, consideration of the testimony of defendant's witnesses does not save plaintiff's claim. In fact, Reddy's testimony, that he has looked at a few dozen radiators in various apartments and a decent amount were the Slant/Fin radiator which he believes is the standard radiator based on its predominance throughout the building, coupled with plaintiff's testimony that her radiators were cast iron and manufactured by Governale, makes it even less likely that the broken radiator was standard building equipment.

Plaintiff further contends that she has established a breach of the proprietary lease citing to *O'Hara v Board of Directors of the Park Ave. & Seventy-Seventh St. Corp.*, 206 AD3d 476 (1st Dept 2022). The *O'Hara* court found that the plaintiff had stated a cause of action for breach of the proprietary lease which required that the Co-op maintain all structural parts of the building and rejected the owner's claim that they were not responsible for structural damage caused by other shareholders because the duty to maintain the building in good repair was nondelegable pursuant to Administrative Code of the City of New York sec. 27-2005(a) (*id.*, at 477 – 478).

[* 16]

*O'Hara* is inapplicable here because that case involved a specific proprietary lease provision requiring the Co-op to maintain all structural parts of the building and the claims at issue involved structural cracks in the wall and ceiling of the plaintiff's apartment. As such, the claims fell squarely within the Co-op defendant's leasehold obligations. At bar, we have a specific proprietary lease provision which places the responsibility for radiators on the unit owners, except where the radiator is standard building equipment. Further, the building here is not seeking to avoid responsibility by claiming that the damage was caused by another unit owner in the building.

Plaintiff next claims that the defendant admitted liability or responsibility for the repair or agreed to make the repair. There are in fact two writings, both by Ballison, that advise plaintiff, first on February 4, 2015, that the floors are the building's responsibility, and second on March 31, 2015, that the floors will be paid by the corporation as previously stated. Defendant is bound by its written promise to pay for the repairs to the floor. Defendant does not claim that Ballison lacked the authority to bind it in this regard.

As to plaintiff's claim that defendant reneged on its agreement to abate her maintenance, there is no evidence in the record to support this claim and no proprietary lease provision supports a claim for abatement of maintenance. Paragraph 4(b) of the proprietary lease provides that:

> In case the damage resulting from fire or other cause shall be so extensive as to render the apartment partly or wholly untenantable, of if the means of access thereto shall be destroyed, the rent hereunder shall proportionately abate until the apartment shall again be rendered wholly tenantable of the means of access restored; but if said damage shall be caused by the act or negligence of the Lessee or the agents, employees, guests or members of the family of the Lessee or any occupant of the apartment, such rental shall abate only to the extent of the rental value insurance, if any, collected by the Lessor with respect to the apartment.

Here, since plaintiff had the duty to maintain the radiator under the proprietary lease, and since she failed to show that any of the insurance proceeds received by the defendant were paid on account of rental value insurance, this claim also fails.

Damages:

Plaintiff is entitled to an award of damages for all expenditures that directly relate to the repair of the floors. Plaintiff made a detailed presentation of her damages, including a spreadsheet, estimates, invoices, receipts, and credit card statements in addition to her testimony.

Plaintiff is entitled to an award of:

$20,802.40 for payments made to flooring subcontractor Norwegian Wood;

$14,582.00 for a portion of her payments made to Batiment, the General Contractor for work specifically associated with the floor and work necessary to complete the flooring project, including invoiced categories Preparation/Garbage - $3,000.00, Remove 2 Subfloors, hardwood Floor and sleeves - $5,250.00, Plywood Installation - $1,500.00, Materials $3,200.00, Install Baseboard - $1,200.00, and Poplar baseboards - $432.00;

$6,133.11 for payments made to Lumber Liquidators for flooring materials;

$3,535.00 (representing 50% of the $7070.00 total paid) to Paradiso for design and project management and consulting services provided for the wood floors and walls of the apartment; and

$10.74 paid to Vintage Flooring.

Plaintiff is thus entitled to a total damages award associated with the work to restore the floor for a total of $45,063.25.

For a complete record, plaintiff's damages claims for Gilsanz, the structural engineer, RTK Environmental for a mold study, IKEA for Individual Kitchen Planning, Traemand for cabinet assembly, M. Miller & Son, LLC, for plaintiff's public adjuster's anticipated fee on her recovery, Demar Plumbing for radiator work, D2P Cleaning Services, Junk My Trash and Home Depot for dehumidification supply/rental, Tribeca Paint, Fabric Renewal, the estimated cost of

plaintiff's lodging while staying in New York and her travel expenses to and from New York, plaintiff's return of two months of rent and a security deposit to McGinnis, her claimed value of lost rental and payment of her maintenance, her checking bank fees, and her Con Edison bills are denied in all respects. These damages claims do not relate directly to the expenditures for the repair of the floors for which defendant agreed to pay.

Lastly, plaintiff's claim, sounding in conversion, to recover the $16,281.93 for which the building's insurance paid for the claim related to the radiator casualty, is denied. This claim was allowed by defendant's insurance, less a $10,000.00 deductible, and defendant received a $6,2081.93 payment. The defendant authorized a payment of $16,281.93 in September 2015 provided that plaintiff accept this offer, which plaintiff did not accept. Since the award granted by this Court of $45,063.25 exceeds the $16,281.93, any additional recovery of this amount would be duplicative of the award of $45,063.25.

Accordingly, it is hereby

ORDERED that the Clerk shall award judgment in favor of the plaintiff and against the defendant in the total amount of $45,063.25, plus interest at the rate of 9% from the date of March 15, 2015 to the date of this order in the sum of $_____, and thereafter at the statutory rate as taxed by the Clerk in the sum of $_____, plus costs and disbursements as taxed by the Clerk, upon the submission of an appropriate bill of costs, for a total sum of $_____.

_____
DAVID B. COHEN, J.S.C.
HON. DAVID B. COHEN
J.S.C.

DATE: 2/17/2026

Check One:  [X] Case Disposed     [ ] Non-Final Disposition

Check if Appropriate:  [ ] Other (Specify _____ )